IN THE UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

SUSAN NORRIS, Personal Representative )
of the Estate of William James Owens, )
                                                             )
                     Plaintiff,                   )        Case No. 04-578-KI
                                                             )
       vs.                                         )        OPINION
                                                             )
ROBERT LAMPERT, JEFFREY JONES, )
MICHAEL PAYNE, ROBERT JONES, )
D. DELVALLE, JAMES HOLLOPETER, )
R. HEINZELMAN, )
                                                             )
                   Defendants.         )

       Mark Radar
       Radar, Stoddard & Perez P. C.
       381 W. Idaho Avenue
       Ontario, Oregon  97914

       John B. Lamborn
       Mallon & Lamborn P. C.
       90 W. Washington
       Burns, Oregon  97720

             Attorneys for Plaintiff

      Hardy Myers
      Attorney General
      David L. Kramer
      Assistant Attorney General
      Department of Justice
      1162 Court Street N. E.
      Salem, Oregon 97301-4096

           Attorneys for Defendants

KING, Judge:

Susan Norris, personal representative for the estate of William Owens ("Owens"), brings this action against Robert Lampert, superintendent of the Snake River Correctional Institution ("SRCI"), and Jeffrey Jones, Michael Payne, Robert Jones, Dezi Delvalle, James Hollopeter, and Rick Heinzelman, corrections officers at SRCI, arising out of an incident that caused the death of Owens on April 29, 2002 while he was a prisoner at SRCI. Before me is defendants' Motion for Summary Judgment (#25). For the following reasons, I grant the motion.

## BACKGROUND

I.    <u>Procedural Background</u>

On July 1, 2004, defendants filed a motion to dismiss/strike many of the claims and defendants in this action. Plaintiff filed an Amended Complaint. Defendants agreed that most, but not all, of the issues raised in their motion were made moot by the Amended Complaint. The court denied the Rule 12 motion as moot, allowed the filing of the Amended Complaint, and gave defendants leave to raise certain issues from the first motion in a subsequent motion. Defendants have now filed a motion for summary judgment.

Plaintiff Norris, personal representative for the estate of Owens, brings five claims in her Amended Complaint: (1) under Section 1983 and the Fourth Amendment, excessive use of force by corrections officers; (2) under Section 1983 and the Eighth Amendment, infliction of cruel and unusual punishment by corrections officers; (3) under Section 1983, supervisory liability against Robert Lampert, superintendent of the Snake River Correctional Institution; (4) under Section 1983 and the Fourth and Eighth Amendments, failure to intercede on plaintiff's behalf by corrections officers; and (5) under the Fourteenth Amendment, deprivation of due process against corrections officers and Lampert.

Defendants argue that they are entitled to summary judgment on all claims. Plaintiff concedes in her briefing and clarified in oral argument that her first, fourth and fifth claims are either subsumed in her second claim or are causes of action unavailable to her. Accordingly, only the second and third claims for relief are viable claims at issue here.

II.  Factual Background

Between 6:30 am and 1:00 pm, defendant Dezi Delvalle made 13 "tier checks" and did not notice anything unusual about Owens.

A videotape documents the events summarized here, although a seven minute gap exists at the beginning of the tape. Beginning recording at 1:16 pm, corrections officers and a nurse looked through Owens' cell door to see Owens lying face down on the floor of his cell, breathing. Blood was on the wall and on the floor. Owens did not respond to commands. Part of a broken pair of glasses was visible. The nurse called in to the cell, "Can I help you in any way?" She received no response.

Defendant Robert Jones urged the application to Owens of chemical "freeze-plus" spray. The tape was stopped for seven minutes, during which time someone (not defendant Robert Jones) sprayed Owens with the chemical. When the camera began recording again, Owens was seated on the bunk. Owens started stabbing himself in the neck with what was later determined to be a broken pen. He was sprayed with the chemical again. He then stood up and faced his cell door with the broken pen clenched in his fist. When he did not obey orders to drop the broken pen, he was sprayed a final time with the chemical. Owens then placed his hands on the bunk, but when he was directed to put down the weapon and lay on the bunk, he stood up and faced the cell door again with the broken pen in his hand.

Corrections staff paged Owens' caseworker, Genelle Atkins-Mackey, but she could not respond because she was giving a tour of the prison to community college students. Atkins-Mackey asked Brad Holt, another mental health worker, to respond. Holt did not appear at the scene until after the paramedics had arrived. The distance from his office to the cell is a five minute walk. Neither of these people are defendants.

The officer-in-charge of the Disciplinary Segregation Unit ("DSU"), Lt. Tiza[1] Ross (not a defendant), ordered a response team–sometimes called a cell extraction team–to enter Owens' cell, forcibly subdue and disarm him by multiple knee strikes, apply physical restraints to his wrists and ankles, and then extract him from the cell. Lt. Ross directed defendant Jeffrey Jones to be the team leader. As the team leader, defendant Jeffrey Jones was responsible for implementing Lt. Ross' orders.

---

[1] Also referred to as Tirza.

The corrections officers entered Owens' cell, directing Owens to drop the weapon. Defendant Robert Jones administered approximately five knee strikes to Owens, although he remembers administering most of them to his plastic shield into Owens' shoulders. Once subdued, Owens was escorted by the team to the DSU intake center for further processing (which generally includes a skin search for weapons, cleaning of chemical spray residue, and medical care).

Owens was repeatedly told to stop resisting during the walk to the intake center and while restrained to the intake center wall. At the DSU intake center, Owens' wrists were attached to a chain secured to the wall. When Owens failed to place his forehead on the wall, defendant Robert Jones audibly knocked Owens' forehead against the wall.

Owens pushed back against the corrections officers, at which time he was taken to the floor. The corrections officers held his arms and legs and ordered him to calm down. At this point, the recording does not clearly depict in which position Owens was placed, although he appears to be on his left side and chest. Owens' hands were cuffed behind him and his wrists were pulled up and away from his back. A voice can be heard to say, "Owens? We want to get you some medical help. We need you to cooperate with us. Can you cooperate with us?"

While on the floor, Owens vomited blood and quit breathing. He received emergency medical care and was pronounced dead at the scene.

Owens had been an inmate for more than 12 years. He had a history of mental illness, and a history of violence. He had received ongoing mental health treatment and medications at SRCI; he was seen by a nurse daily and by his caseworker every 2 to 3 days. He was not deemed

a suicide threat in the weeks before the incident. He had not taken his medication in the days prior to the event.

Defendant Robert Lampert had no personal involvement in any of the events summarized above. He was not personally involved in the process of providing Owens with mental health care or treatment.

## LEGAL STANDARDS

Summary judgment is appropriate when there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law. Fed. R. Civ. P. 56(c). The initial burden is on the moving party to point out the absence of any genuine issue of material fact. Once the initial burden is satisfied, the burden shifts to the opponent to demonstrate through the production of probative evidence that there remains an issue of fact to be tried. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). On a motion for summary judgment, the evidence is viewed in the light most favorable to the nonmoving party. Robi v. Reed, 173 F.3d 736, 739 (9th Cir.), cert. denied, 528 U.S. 375 (1999).

## DISCUSSION

I.     Second Claim for Relief: Infliction of Cruel and Unusual Punishment

In her second claim for relief, plaintiff asserts that defendants' conduct, forcing Owens to "remain face down in a prone position while physically injured, shackled with hard restraints and suffering from delusions," constitutes cruel and unusual punishment in violation of Owens' Eighth Amendment rights. Amended Complaint ¶ 20. Plaintiff also alleges that the corrections officers improperly failed to consider information that Owens was paranoid schizophrenic and had not been administered his antipsychotic medications in making the decision to extract Owens

from his cell. Plaintiff appears to be raising an excessive use of force claim, as well as a claim of deliberate indifference to medical needs, under the Eighth Amendment.

### A. Excessive Use of Force

In evaluating excessive use of force claims, the touchstone is whether the use of force was applied "in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm." Whitley v. Albers, 475 U.S. 312, 320-21 (1986). In applying this test, the following factors are relevant: (1) the need for application of force, (2) the relationship between the need and the amount of force that was used, (3) the extent of injury suffered by the inmate, (4) the extent of the threat to the safety of staff and inmates, as reasonably perceived by responsible officials on the basis of facts known to them, and (5) any efforts made to temper the severity of the forceful response. Id. at 321; standard reiterated in Hudson v. McMillian, 503 U.S. 1, 7-8 (1992) (test applies whenever guards use force to keep order, whether the disturbance is a riot or a lesser disruption).

The test involves both a subjective component and an objective component. "[C]ourts considering a prisoner's claim must ask both if 'the officials act[ed] with a sufficiently culpable state of mind' and if the alleged wrongdoing was objectively 'harmful enough' to establish a constitutional violation." Hudson, 503 U.S. at 8, quoting Wilson v. Seiter, 501 U.S. 294, 298 (1991).

Defendants argue that they did not have the subjective intent necessary for an excessive use of force claim. The decision to forcibly extract Owens from his cell was made by the officer-in-charge of the DSU, not any of the named defendants. The defendants also argue that they were faced with a dangerous situation, involving an armed inmate bent on stabbing himself.

Page 7 - OPINION

Owens failed to respond to verbal commands, was not subdued by chemical spray, and continued to resist officers even after being disarmed and physically restrained. They claim there is no showing of ill will or intent to harm Owens.

Plaintiff responds that the first and repeated application of chemical spray, the knee strikes to Owens by defendant Robert Jones, the "slamming" of Owens' head against the wall by defendant Robert Jones, and the holding of Owens in an "illegal hog-tie position until he died" were malicious and sadistic escalations of force against an inmate who simply needed medical attention.[2]

The undisputed evidence shows Owens lying face-down on the floor, with blood on the floor and wall, but breathing, his hands hidden from view, with part of a broken pair of glasses visible in the room. Defendant Jeffrey Jones, the team leader and participant in the cell extraction, testifies that in his experience inmates can be deceptive by "playing possum" and pretending to be unconscious so as to lure corrections officers into a potentially dangerous situation. Nevertheless, it is clear that an intervention on the part of the corrections officers was necessary. After the initial application of the chemical spray, the undisputed evidence shows Owens inflicting injury on himself. Furthermore, the undisputed evidence shows Owens repeatedly failing to comply with instructions to drop the broken pen, something that the corrections officers perceived to be a weapon.

---

[2]Plaintiff also argues that a question of fact exists as to whether the corrections officers ignored their training regarding the management of self-injurious inmates. She asserts that corrections officers may have been "caught up in wanting to protect or wanting to control and punish" Owens because of his self-injurious actions. The argument does not fit into the Eighth Amendment rubric, unless officers were intending to hurt Owens. Plaintiff offers no facts to support this contention.

The overall depiction is one of slow escalation of force: the corrections officers applied chemical spray three times and only after the spray was unsuccessful did they enter the unit and apply enough force to afford them the ability to place restraints on him. After the team restrained him, Owens was able to stand up and walk down a flight of stairs and through the hallway to the DSU intake center. When he resisted, the corrections officers repeatedly told Owens to stop resisting, to cool down and think. Once he was on the floor, someone assured him that the corrections officers wanted to provide medical assistance to him.

Defendant Jeffrey Jones testifies that "all of the force used was for the purpose of disarming and securing inmate Owens, and for protecting himself and others from further harm." Aff. Jeffrey Jones ¶ 8. The other corrections officers testify, "Throughout [the extraction process] I felt that Inmate Owens was dangerous to himself and others. It was never my intent to cause Inmate Owens any unnecessary or unreasonable pain or injury." Aff. Dezi Delvalle ¶ 6; Aff. James Hollopeter ¶ 6; Aff. Michael Payne ¶ 6; Aff. Robert Jones ¶ 6.[3]

The only defendant who arguably comes close to engaging in excessive use of force is defendant Robert Jones. It was he who urged the application of chemical spray initially, who administered the knee strikes, who forcefully positioned Owens' head against the wall, and who ordered the take down of Owens to the floor.

However, even defendant Robert Jones' actions do not rise to the level of excessive use of force. He did not administer the chemical spray at any time. In addition, he testifies that he remembers administering the knee strikes to Owens in the cell "trying to get him to comply so

---

[3]Defendants do not submit an affidavit from defendant Rick Heinzelman, but plaintiff does not charge him with engaging in any actions different from the other corrections officers.

that the weapon could be removed from his hand. And after the weapon was removed all force was stopped and restraints were put on him." Depo. Robert Jones, p. 35, ll. 6-10. The videotape corroborates his testimony.

While in the DSU intake center, defendant Robert Jones testifies about forcefully pushing Owens' head into the wall as follows:

> Q: Do you recall putting your hand back on his head and pushing his head towards the wall?
> A: I do remember him forcing back against staff very violently. Pushing back hard. And I did put my hand back up to his head to stop him from coming back.
> Q: Did his head then make contact with the wall?
> A: His head did go forward and I heard it go against the wall, yes.

Depo. Robert Jones, p. 45, ll 6-13. The videotape confirms his testimony.

And about the decision to bring Owens to the floor, he testifies:

> Q: Do you recall anything about the events as Mr. Owens is going to the floor?
> A: Just that I said we need to take him to the floor. Because he was continuing to fight with staff. And he had lots of blood that was going all over the place. And to protect staff safety, and also from hurting himself anymore, I said, "Take him to the floor."
> Q: That was your voice saying, "Take him down"?
> A: Yes.
> Q: As Mr. Owens goes down do you have any specific recollections about that event?
> A: Just that he was very hard to take down to the floor. He was very, very strong. Very, very strong. And it took all of us physically to get him down to the floor.

Id. at 45-46, ll. 17-8.

Plaintiff offers only the opinion of Chase Riveland, a legal consultant with experience as Secretary for the Department of Corrections for the State of Washington, in an attempt to rebut the defendants' evidence that they lacked the requisite state of mind. Mr. Riveland opines that he is "very concerned about the apparent lack of concern the corrections officers had for the well

being of Mr. Owens." Aff. Chase Riveland ¶ 6. However, Mr. Riveland noticeably does not describe the use of force as unreasonable, as needless, or as excessive based on his experience as a manager and administrator of fifteen prisons and community corrections facilities.

As for whether Owens was placed in a "hog tie" position prior to his death, defendants assert, and plaintiff does not deny, that Owens feet were never bound to his hands. OAR 291-013-0010(1) defines "hog tie method" as "binding a persons' <u>wrists and ankles</u> together behind the back while in a prone position." (emphasis added). Defendant Jeffrey Jones testifies in a supplementary affidavit that inmates should not be put on their stomach with their hands and feet "bowed" behind them because placing someone in that position for extended periods could possibly impair that person's ability to breath normally. Furthermore, he testifies,

> At no time was Mr. Owens 'hog tied.' At no time did the officers in this case bind Mr. Owens' hands to his feet. I do not recall him being in a prone position and, if he was in such a position, it was only for a few seconds at the point he was first taken to the floor. After he was stabilized on the floor, he was placed onto his side.

Supp. Aff., Jeffrey T. Jones, ¶ 3.

Plaintiff responds with an autopsy report conducted on Owens. The medical examiner, Dr. Brauer, revealed that the probable cause of death was "restraint asphyxiation in excited delirium." He based this conclusion on the following: (1) psychiatric or drug induced state of agitated delirium in conjunction with police confrontation placed catecholamine stress on the heart; (2) hyperactivity associated with the state of agitated delirium coupled with struggling against police and restraints increased the oxygen delivery demands on the heart and lungs; and (3) the hog tied position impaired breathing in situations of high oxygen demand by inhibiting chest wall and diaphragmatic movement.

Defendants dispute the use of Dr. Brauer's opinion. Dr. Brauer is a family practice doctor who provides services as a medical examiner for Malheur County. In his deposition, he admitted that he is not a pathologist, and has no particular training in pathology, and is not an expert in the area of restraint asphyxia or positional asphyxia. According to defendants, then, he does not qualify as an expert to testify about the cause of Owens' death.

I need not reach resolution on the use of Dr. Brauer's opinion because regardless of whether Owens died as a result of positional asphyxia, plaintiff has not met her burden of proof on summary judgment in raising a genuine issue of material fact as to the state of the corrections officers' minds. For example, plaintiff has not shown that the statements made by the corrections officers might be impeached at trial or that one of them could provide additional or different testimony on his state of mind. In addition, plaintiff's expert does not opine that the corrections officers' actions were unreasonable based on his experience in extracting inmates from their cells. Viewing the evidence in the light most favorable to plaintiff, no reliable inference can be made that the corrections officers applied force "maliciously and sadistically for the very purpose of causing harm." Whitley, 475 U.S. at 320-21.

  B. <u>Deliberate Indifference to Medical Needs</u>

Deliberate indifference to serious medical needs of prisoners constitutes "unnecessary and wanton infliction of pain" proscribed by the Eighth Amendment. <u>Estelle v. Gamble</u>, 429 U.S. 97, 104 (1976). To prevail on a claim of the denial of adequate medical care, plaintiff must prove that defendants were deliberately indifferent to his serious medical needs. <u>Lopez v. Smith</u>, 203 F.3d 1122, 1131 (9th Cir. 2000). Prison officials are deliberately indifferent to a prisoner's serious medical needs when they deny, delay, or intentionally interfere with medical treatment.

Id. Deliberate indifference is evidenced only when the official knows of and disregards an excessive risk to inmate health or safety. Clement v. Gomez, 298 F.3d 898, 904 (9th Cir. 2002). Additionally, mere negligence is insufficient for liability. Id. Rather, the prisoner must show that the course of treatment undertaken was medically unacceptable under the circumstances, and that the defendants chose this course in conscious disregard of an excessive risk to plaintiff's health. Jackson v. McIntosh, 90 F.3d 330, 332 (9th Cir. 1996).

Plaintiff contends that a serious medical need existed because Owens was discovered with blood on the floor of his cell just moments after a tier check found him to be well.[4] Instead of proceeding as if this were an acute medical situation, the defendants treated Owens as a physical risk.

Defendants assert that plaintiff's claim fails for two reasons. First, none of the defendants were responsible for plaintiff's health care. Second, there is no showing that any of the defendants acted with the requisite mental state. Indeed, the reason they initiated the cell extraction was to prevent Owens from stabbing himself. Finally, defendants offer the opinion of Genelle Atkins-Mackey, a provider of mental health services at SRCI, about the risk of providing medical care prior to securing the weapon and Owens. She states, "During the events depicted on the videotape, it would have been unsafe and inappropriate for a mental health professional to attempt to intervene or provide treatment to Mr. Owens at any point." Aff. Genelle Atkins-Mackey, ¶ 6.

---

[4] Plaintiff does not allege that defendants failed to provide medical care by allowing Owens to skip his antipsychotic medications.

Viewing the evidence in the light most favorable to plaintiff, the corrections officers were not deliberately indifferent to Owens' medical needs. Corrections officers entered Owens' cell to remove the object with which he was hurting himself and to provide medical care. As explained above, the corrections officers proceeded cautiously because of experience with inmates "playing possum." Moreover, plaintiff does not question the testimony of Ms. Atkins-Mackey; it was reasonable for the corrections officers to secure Owens first prior to offering him medical treatment.

Accordingly, I grant summary judgment to defendants on plaintiff's second cause of action.

II. Third Claim for Relief: Supervisory Liability of Robert Lampert

Plaintiff brings her third claim against Lampert, on the basis of supervisory liability. Plaintiff alleges that Lampert failed to train his corrections officers, rarely disciplined corrections officers for using excessive force, and failed to discipline the corrections officers for their misconduct here. Plaintiff alleges that Lampert was responsible for the operation of SRCI, including training, and that the corrections officers were not trained on the risk of positional asphyxia.

A "supervisor is only liable for constitutional violations of his subordinates if the supervisor participated in or directed the violations, or knew of the violations and failed to act to prevent them." Taylor v. List, 880 F.2d 1040, 1045 (9th Cir. 1989). Plaintiff admits that Lampert was not personally involved. Furthermore, plaintiff admits that while Lampert was superintendent, he did not receive any complaints that the corrections officers here had previously used excessive force or that there was a need to discipline any of them for using

excessive force. Plaintiff also admits that Lampert "did not approve or condone, tacitly or otherwise, any pattern of improper actions by corrections staff towards inmates, whether involving the use of force or otherwise. Before this incident he did not fail to take remedial action against corrections staff . . . ." Def. Concise Statement of Material Facts, ¶ 6.

The crux of plaintiff's argument seems to be that Lampert inadequately trained the corrections officers. An "inadequate training" claim can be the basis for section 1983 liability in "limited circumstances." Board of County Com'rs of Bryan County, Okl. v. Brown, 520 U.S. 397, 407 (1997), quoting City of Canton, Ohio v. Harris, 489 U.S. 378, 389 (1989). The Court described a training program that does not prevent constitutional violations, putting decision makers on notice that a new program is necessary. "[C]ontinued adherence to an approach that [decision makers] know or should know has failed to prevent tortious conduct by employees may establish the conscious disregard for the consequences of their actions–the 'deliberate indifference'–necessary to trigger . . . liability." Id. Plaintiff has not provided any evidence of additional instances of constitutional violations such that this claim could be made out here.

Accordingly, I grant defendants' motion for summary judgment on plaintiff's third claim for relief against Robert Lampert.

Finally, because I find that defendants are entitled to summary judgment on all claims, I do not reach defendants' alternative argument that they are entitled to qualified immunity.

///

///

## CONCLUSION

Defendants' Motion for Summary Judgment (#25) is granted. The case is dismissed with prejudice.

Dated this ____7th____ day of July, 2005.

                                                      /s/ Garr M. King
                                                      Garr M. King
                                                      United States District Judge